NEWMAN, Circuit Judge,
concurring in part, dissenting in part.
The ascendance of section 101 as an independent source of litigation, separate from the merits of patentability, is a new uncertainty for inventors. The court, now rehearing this case en banc, hoped to ameliorate this uncertainty by providing objective standards for section 101 patent-eligibility. Instead we have propounded at least three incompatible standards, devoid of consensus, serving simply to add to the unreliability and cost of the system of patents as an incentive for innovation. With today’s judicial deadlock, the only assurance is that any successful innovation is likely to be challenged in opportunistic litigation, whose result will depend on the random selection of the panel.
Reliable application of legal principles underlies the economic incentive purpose of patent law, in turn implementing the benefits to the public of technology-based advances, and the benefits to the nation of industrial activity, employment, and economic growth. Today’s irresolution concerning section 101 affects not only this court and the trial courts, but also the PTO examiners and agency tribunals, and all who invent and invest in new technology. The uncertainty of administrative and judicial outcome and the high cost of resolution are a disincentive to both innovators and competitors.
I
Today’s Impasse
In deciding to rehear the patent dispute between CLS Bank and Alice Corporation, the embanc court undertook to remedy distortions flowing from inconsistent precedent on section 101. This remedial effort has failed. This failure undoubtedly reflects the difficulty of the question; I suggest that it also demonstrates that an all-purpose bright-line rule for the threshold portal of section 101 is as unavailable as it is unnecessary. Experience over two centuries of United States patent law supports this conclusion.
Section 101 is not the appropriate vehicle for determining whether a particular technical advance is patentable; that determination is made in accordance with the rigorous legal criteria of patentability. Contrary to the diverse protocols offered by my colleagues, it is not necessary, or appropriate, to decide whether subject matter is patentable in order to decide whether it is eligible to be considered for patentability.
This section 101 issue appears to have its foundation in. a misunderstanding of patent policy, for the debate about patent eligibility under section 101 swirls about concern for the public’s right to study the scientific and technologic knowledge contained in patents. The premise of the debate is incorrect, for patented information is not barred from further study and experimentation in order to understand and build upon the knowledge disclosed in the patent.
Judicial clarification is urgently needed to restore the understanding that patented knowledge is not barred from investigation *1322 and research. The debate involving section 101 would fade away, on clarification of the right to study and experiment with the knowledge disclosed in patents.
These issues have arisen in connection with today’s newest fields of science and technology; that is, computer-based and related advances, and advances in the biological sciences. These fields have spawned today’s dominant industries, and produced spectacular benefits. I have seen no competent analysis of how these technologies and industries would be affected by a fundamental reduction in patent-eligibility. Dramatic innovations, and public and economic benefits, have been achieved under the patent law as it has existed.
Thus I write separately to propose that the court resolve the present impasse by returning to the time-tested principles of patent law. I propose that the court reaffirm three basic principles relating to section 101, as follows:
1. The court should hold that section 101 is an inclusive statement of patent-eligible subject matter— I propose that the court reaffirm that patent-eligible subject matter is as stated in the patent statute. The court should acknowledge the statutory purpose of section 101, to provide an inclusive listing of the “useful arts.” Then, upon crossing this threshold into the patent system, examination of the particular subject matter on the substantive criteria of patentability will eliminate claims that are “abstract” or “preemptive,” on application of the laws of novelty, utility, prior art, obviousness, description, enablement, and specificity. There is no need for an all-purpose definition of “abstractness” or “preemption,” as heroically attempted today.
2. The court should hold that the form of the claim does not determine section 101 eligibility— I propose that the court make clear that patent eligibility does not depend on the form of the claim, whether computer-implemented innovations are claimed as a method or a system or a storage medium, whether implemented in hardware or software. Patent eligibility does not turn on the ingenuity of the draftsman. The differences among my colleagues’ views of this aspect simply add to the instability and uncertainty of patenting and enforcement.
3.The court should confírm that experimental use of patented information is not barred— Misunderstanding of this principle appears to be the impetus for the current debate, for the popular press, and others who know better, have stated that patented subject matter cannot be further studied. This theory is presented to support section 101 ineligibility, on the reasoning that important discoveries should be ineligible for patenting so that they can be further studied. I propose that the court reaffirm the long-standing rule that study and experimentation are not infringement, whether the experimentation is for basic or applied purposes.
On adoption of these principles the law of section 101 will be stabilized, and patentability can continue to be determined in accordance with statute and precedent.
II
Experimental Use of Patented Information
I start with this issue, for the misperception that study of patented subject matter is precluded, has placed a misdirected spin on section 101.
The idea that experimentation with patented information is restricted is the basis of the view that patenting inhibits scientific advance. For example, the Court stat *1323 ed in Mayo Collaborative Servs. v. Prometheus Labs., Inc., — U.S. -, 132 S.Ct. 1289, 1301, 182 L.Ed.2d 321 (2012) that “there is a danger that the grant of patents that tie up their use will inhibit future innovation premised upon them, a danger that becomes acute when a patented process amounts to no more than an instruction to ‘apply the natural law,’ or otherwise forecloses more future invention than the underlying discovery could reasonably justify.”
However, the Court has recognized that “[t]he federal patent system thus embodies a carefully crafted bargain for encouraging the creation and disclosure of new, useful, and unobvious advances in technology and design in return for the exclusive right to practice the invention for a period of years.” Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 150-51, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989). See J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l Inc., 534 U.S. 124, 142, 122 S.Ct. 593, 151 L.Ed.2d 508 (2001) (“The disclosure required by the Patent Act is ‘the quid pro quo of the right to exclude.’ ”); Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 484, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974) (same).
This disclosure is available to produce further advance, on further study and experimentation. The Court long ago recognized that the scientific and technological information in patents may be studied, evaluated, tested, improved upon, compared, etc., as explained by Justice Story in Whittemore v. Cutter:
It could never have been the intention of the legislature to punish a man, who constructed such a machine merely for philosophical[1] experiments, or for the purpose of ascertaining the sufficiency of the machine to produce its described effects.
29 F. Cas. 1120, 1121 (C.C.D.Mass.1813). The Court reiterated this principle in Graham v. John Deere Co., referring to the “inherent requisites in a patent system”:
Innovation, advancement, and things which add to the sum of useful knowledge are inherent requisites in a patent system which by constitutional command must “Promote the Progress of ... useful Arts.” This is the standard expressed in the Constitution and it may not be ignored.
383 U.S. 1, 6, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) (ellipses in original). The reference to “useful knowledge” cannot mean that the knowledge disclosed in patents is untouchable for seventeen years.
The Federal Circuit has reaffirmed that “patenting does not deprive the public of the right to experiment with and improve upon the patented subject matter.” In re Rosuvastatin Calcium Patent Litig., 703 F.3d 511, 527 (Fed.Cir.2012). However, in Embrex, Inc. v. Senice Engineering Corp., 216 F.3d 1343, 1349 (Fed.Cir.2000), the court stated that the experimental use defense was “very narrow” and unavailable when “the inquiry has definite, cognizable, and not insubstantial commercial purpose,” the concurrence adding that “neither the statute nor any past Supreme Court precedent gives any reason to excuse infringement because it was committed with a particular purpose or intent, such as for scientific experimentation,” id. at 1353. Precedent does not support this theory.
The right to study and experiment, to evaluate and improve upon the information in patents was discussed by our predecessor Court of Claims in Ordnance Engineering Corp. v. United States, 84 Ct.Cl. 1 (1936) and in Chesterfield v. United States, 159 F.Supp. 371 (Ct.Cl.1958), the court explaining that experimentation does not *1324 infringe the patent. Factual distinctions may arise, as in Pitcairn v. United States, 212 Ct.Cl. 168, 547 F.2d 1106 (1976), where the Court of Claims held that of 2200 infringing helicopters, the use of 93 helicopters for testing or demonstration was not an “experimental use,” as compared with the truly “experimental helicopters” that the patentee did not accuse of infringement.
Scholars have explained this essential policy of patent systems, whereby patented information adds to the body of knowledge, and the right to exclude does not prohibit further study of patented technology. See Rebecca S. Eisenberg, Patents and the Progress of Science: Exclusive Rights and Experimental Use, 56 U. Chi.L.Rev. 1017, 1022 (1989):
If the public had absolutely no right to use the disclosure without the patent holder’s consent until after the patent expired, it would make little sense to require that the disclosure be made freely available to the public at the outset of the patent term. The fact that the patent statute so plainly facilitates unauthorized uses of the invention while the patent is in effect suggests that some such uses are to be permitted.
See Janice M. Mueller, The Evanescent Experimental Use Exemption from United States Patent Infringement Liability: Implications for University and Nonprofit Research and Development, 56 Baylor L.Rev. 917, 921 (2004):
The publication of information about a new invention in the form of an issued patent is of little use to society if that information is effectively kept ‘on ice’ for seventeen-eighteen years by means of a patent owner’s unchecked right to exclude others from use for any purpose.
See also Katherine J. Strandburg, What Does the Public Get? Experimental Use and, the Patent Bargain, 2004 Wis. L.Rev. 81 (2004) (distinguishing between infringing and non-infringing uses of information disclosed in patents, by differentiating between permissible “experimenting on” patented inventions, and impermissible “experimenting with” things that are patented); Andrew S. Baluch, Relating the Two Experimental Uses in Patent Law: Inventor’s Negation and Infringer’s Defense, 87 B.U. L.Rev. 213 (2007) (proposing that the right of experimental use by others balances the experimental use exception to § 102(b)).
Patents do not prevent experimentation with patented subject matter, whether the purpose is scientific knowledge or commercial potential. To hold otherwise would be to deny a foundation of the system of patents. However, the popular press has accepted the theory that experimentation is barred for patented subject matter,[2] as have my colleagues, who cite that position as grounds for restricting eligibility under section 101.[3]
The patent statute requires that the patented information is made known (“patent” is derived from the latin “patere,” which means “to lie open”), and that the patentee provide details of how to make and use the *1325 patented subject matter. In return, the patentee receives a term of exclusivity that has traditionally been applied only against commercial practice. On this simple bargain the industrial age blossomed, built on improvements and advances in patented subject matter.
Judicial precedent is sparse on the issue of' experimental use, for until recently the principle was not in question. Technical publications often describe research in patent-heavy fields, apparently without fear of lawsuits. At a recent conference reported in the Patent, Trademark, & Copyright Journal, a spokesman stated that “research has been spurred rather than inhibited as a result of the [Myriad] patents, citing 18,000 researchers who have published over 10,000 articles.... ” 85 PTCJ 759(2013).
In summary, experimental use of patented information can take various forms, including:
a. experiments to improve or build upon patented subject matter— Such studies are encouraged by the patent system; it has never been the law that such experimentation is infringement.
b. experiments to compare patented subject matter with alternatives to determine relative performance and properties— Improvements would be inhibited if new developments could not be compared with the old. Such a position has, never been the law.
c. experimental study of patented subject matter to understand its mechanism— Such scientific study is an important attribute of patent systems. Scientific understanding may or may not lead to new commercial embodiments, which are not excused from infringement if covered by valid claims; but study of patented subject matter is not infringement.
d.experimental study of patented subject matter to find new applications or modifications— Such new directions are a benefit of the patent system; the experimentation is not infringement.
The courts, the press, and the public, have been led down a path that is contrary to patent principles. Let us remove the doubts we have sown. With clarification of the right to experiment with the information disclosed in patents, it will no longer be necessary to resort to the gambit of treating such information as an “abstraction” in order' to liberate the subject matter for experimentation, whether for scientific or commercial purposes. I respectfully dissent from the contrary majority position.
Ill
“Abstraction” in Computer-Based Patents
I turn briefly to the concept of “abstraction” in connection with section 101 eligibility of computer-implemented subject matter. In the case before us, the diverse theories of the role of section 101, presented by the parties and the many amici curiae, show not only the complexity but also the importance of the issue. However, it is not necessary to rewrite the law of patent eligibility.
All scientific and technologic advance starts with fundamental principles, described by my colleagues as “abstract ideas,” although the Court has recognized that “all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.” Mayo, 132 S.Ct. at 1293. Scientific principles are “a creation of the human mind, with its freely invented ideas and concepts,”[4] while the adaptation of such principles to public benefit is the milieu of patents. The Court explained in Mackay *1326 Radio & Telegraph Co. v. Radio Corp. of America, 306 U.S. 86, 94, 59 S.Ct. 427, 83 L.Ed. 506 (1939) that “While a scientific truth, or the mathematical expression of it, is not a patentable invention, a novel and useful structure created with the aid of knowledge of scientific truth may be.”
My colleagues today attempt to devise universal criteria of eligibility under section 101. Some colleagues rely on “abstraction;” while others invoke “preemption;” others look for “meaningful” limitations. I quite agree that it is not easy to define “abstraction” or “preemption” or “meaningful limitation,” yet my colleagues propose that these terms bar the gateway to the patent system. Such definition is as elusive for Alice Corporation’s escrow banking system as for the most complex of phenomena:
The intrinsic uncertainty of the meaning of words was of course recognized very early and has brought about the need for definitions, or—as the word “definition” says—for the setting of boundaries that determine where the word is to be used and where not to. But definitions can be given only with the help of other concepts, and so one will finally have to rely on some concepts that are taken as they are, unanalyzed and undefined.
Werner Heisenberg, Physics and Philosophy 168 (1958).
I propose that the court return to the statute, and hold that when the subject matter is within the statutory classes in section 101, eligibility is established. This conforms with legislative intent. See Diamond v. Chakrabarty, 447 U.S. 303, 308, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980) (“In choosing such expansive terms as ‘manufacture’ and ‘composition of matter,’ modified by the comprehensive ‘any,’ Congress plainly contemplated that the patent laws would be given wide scope.”). The Court in Diamond v. Diehr, 450 U.S. 175, 182, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981), reiterated that the system of patents embraces “anything under the sun that is made by man”; it cannot be that computer-implemented developments may or may not be eligible under section 101 depending on how broadly they are sought to be claimed. Breadth of claiming, and undue breadth, are determined under sections 102, 103, and 112, not section 101.
The Court in J.E.M. v. Pioneer recognized that section 101 is a general and “dynamic provision designed to encompass new and unforeseen inventions.” 534 U.S. at 135, 122 S.Ct. 593. In its study of “A Patent System for the 21st Century” (2004) the National Research Council focused on the emerging technologies in a “Knowledge-Based Economy,” and observed that the patent system is “a unitary system with few a priori exclusions.” Id. at 57. It is beyond cavil that the patent system is intended to be receptive to the advances of science and technology.
This court referred to section 101 as a “coarse filter,” see Research Corporation Technologies, Inc. v. Microsoft Corp., 627 F.3d 859, 869 (Fed.Cir.2010). On traversing the coarse filter, the subject matter is subjected to the statutory rigors of novelty, unobviousness, enablement, specificity, etc. This approach places inventions in the statutory framework of patentability, not merely eligibility to be considered for participation in the patent incentive system.
No substitute has been devised for the incentive of profit opportunity through market exclusivity.[5] The court should return to these basic principles, and abandon *1327 its failed section 101 ventures into abstraction, preemption, and meaningfulness.
I repeat my concern for the court’s preservation of legal uncertainty through our inconclusive treatment of the law of section 101. The escrow banking mechanism of the patents in suit is claimed in the Alice Corporation patents as a method or a system or a media device. The form of the claim does not determine section 101 patent eligibility. Nor does the scope of the claim. In claim drafting, it is customary to start with broad claims and then draft claims of progressively narrower scope; this does not determine “abstraction” under section 101. As in O’Reilly v. Morse, 56 U.S. 62, 15 How. 62, 14 L.Ed. 601 (1853), Samuel Morse’s broadest claim was rejected for undue breadth because it was directed to “the use of the motive power of the electric or galvanic current ... for making or printing intelligible characters, letters or signs, at any distances,” id.. at 86; the Court did not discuss “eligibility,” but simply held that this claim was not limited to the “specific machinery” described in the specification, and was unduly broad.
I share the majority view that all of the claims stand or fall together. I would hold that the system, the method, and the media claims are eligible under section 101, and would remand to the district court for determination of patentability under the substantive provisions of the statute.
Dissenting opinion filed by LINN and O’MALLEY, Circuit Judges.
LINN and O’MALLEY, Circuit Judges, dissenting from the Court’s judgment.
The method, media, and system claims we review today must rise and fall together; either they are all patent eligible or they aré not. This is so, not because, as Judge Lourie’s opinion concludes, they are all tainted by reference to the same abstract concept, but because the record we are presented makes clear that they are grounded by the same meaningful limitar tions that render them patent eligible. Thus, we believe the analysis of the method claims conducted by Chief Judge Rader and Judge Moore in Part VI of our collective opinion[1] and Parts III.A and IÍI.B of Judge Lourie’s opinion suffer from the same flaw: they are divorced from the record to which we are bound. We write to address that flaw.
I
We begin with a .careful assessment of the record and procedural posture presented in this case. This appeal arises from a grant of summary judgment in favor of Plaintiff-Appellee CLS Bank International (“CLS”), dismissing the action with prejudice on grounds that none of the asserted claims of U.S. Patent Nos. 5,970,479 (“the '479 patent”), 6,912,510 (“the '510 patent”), 7,149,720 (“the '720 patent”), and 7,725,375 (“the '375 patent”) recite patentable subject matter. The summary judgment process occurred prior to construction of the asserted claims and their attendant limitations. Indeed, the court considered and *1328 granted CLS’s summary judgment motion before ever conducting a hearing pursuant to Markman v. Westview Instruments, Inc., 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), and even before briefing on claim construction. As such, no determination has ever been made regarding how one of skill in the art would understand the claims as of the date of issuance. And, no careful assessment of the intrinsic record’ or prosecution history has ever occurred; much of this was never even made a part of the trial record.
As the trial court recognized, the' only way to avoid these predicate steps before granting summary judgment was for the court to construe the claims as defendant-appellant Alice Corporation (“Alice”) would have it do. The trial court was, thus, required to read into the claims whatever limitations Alice asserted a skilled artisan would assume they possessed. Similarly recognizing the procedural posture in which it asked the trial court to rule, “CLS agreed to assume a construction of claims favorable to Alice.” CLS Bank Int’l v. Alice Corp., 768 F.Supp.2d 221, 236 n. 6 (D.D.C.2011). The trial court did so; it concluded that, “because the relevant terms of claims 33 and 34 of the '479 Patent have yet to be construed, because CLS has agreed to a broad construction[2] of terms favorable to Alice, and because the specification reveals a computer-based invention, the Court can reasonably assume for present purposes that the terms ‘shadow’ credit and/or debit record and ‘transaction’ in the '479 Patent recite electronic implementation and a computer or an analogous electronic device.” Id. at 236 (footnote added).
We must look then to the construction posited by Alice at the summary judgment stage to understand the claims before us. It is undisputed that Alice claimed that “the entirety of Alice’s method [as recited in the '479 and '510 patents]—including the ‘adjusting’ step that effectuates the claimed exchange of obligations—must be performed electronically using a computer and memory.” Memorandum in Support of Alice Corp. Pty. Ltd.’s Renewed Cross-Motion for Summary Judgment as to Patent Eligibility & in Opposition to CLS’s Motion for Summary Judgment at 41, CLS Bank Int’l v. Alice Corp., 768 F.Supp.2d 221. (D.D.C.2011) (No. 1:07-cv-974), ECF No. 95 [hereinafter “Alice’s Summ. J. Br.”]., Specifically, Alice argued that a skilled artisan would appreciate that the method claims necessarily require electronic implementation of each of their steps and that this electronic implementation would occur through a computer. In support of this position, Alice offered an expert declaration by Mr. Paul Ginsberg. See Alice Corp. Pty. Ltd.’s Renewed Cross-Motion for Partial Summary Judgment as to Subject Matter Eligibility, Declaration of Stanley E. Fisher, Exhibit 1, Declaration of Paul Ginsberg, CLS Bank Int’l v. Alice Corp., 768 F.Supp.2d 221 (D.D.C.2011) (No. 1:07-cv-974), ECF No. 95-3 [hereinafter “Ginsberg Decl.”]. In that declaration, Mr. Ginsberg explained how a person of skill in the art would interpret the method claims upon “reviewing the claims in view of the patent specification (including the description of the subject matter in ¶¶ 25-26 above) and the prosecution history.” Id. ¶ 29. Based on this record, both CLS and the trial court accepted the fact that the method claims of the '510 and '479 patents recite “an electronic method for performing the settlement, and the ‘maintaining,’ ‘receiving,’ *1329 ‘adjusting,’ and ‘generating’ steps are central to that process.” Alice’s Summ. J. Br. at 42.
CLS has stood by these stipulations and assumptions on appeal. Indeed, it emphatically has done so. In all of its briefing and in its arguments on appeal, CLS has acknowledged that the shadow credit and debit records and the transactions and adjustments between them must be implemented electronically. Appellee’s Principal En Banc Br. 3, 34; Appellee’s Reply En Banc Br. 20; Oral Arg. at 11:29, CLS Bank Int’l v. Alice Corp., No.2011-1301, available at http://www.cafc.uscourts.gov /oral-argument-recordings/2011-1301/2013-02-08/all [hereinafter “Oral Arg.”]. At oral argument in this en banc proceeding, counsel for CLS confirmed its view that every limitation and electronic process that appears in the system claims must be read into the method claims. Oral Arg. at 11:29-11:55.[3] Thus, counsel for CLS agreed that, given the state of the record we face on appeal, the claims cannot be parsed—they either all are drawn to patentable subject matter, as Alice claims, or none are drawn to patentable subject matter, as CLS claims. Appellee’s Principal En Banc Br. 11, 51 (“Here, the Section 101 analysis is equivalent for all of Alice’s claims.”).
II
Our colleagues ignore the record of the lower court proceedings and the stipulations by which CLS agrees it must be bound. Chief Judge Rader and Judge Moore construe the method claims as far broader than the system claims ' and assume they are sufficiently different from those system claims to merit different treatment under the Supreme Court’s case law governing exceptions to 35 U.S.C. § 101. See Rader/Moore Op. at 1312 (construing “each step” of the method claims as “individually recit[ing] merely a general step inherent within the concept of an escrow, using a third party intermediary in this fashion”). Judge Lourie also construes the method claims broadly, but, unlike the Chief Judge and Judge Moore, imports the breadth he reads into the method claims into the system and media claims as well. See Lourie Op. at 1286-87, 1288-92. None of those judges explains how the record supports the claim constructions in which they engage, however.
Notably, when analyzing the method claims, the Chief Judge and Judge Moore cite to no portion of the written descriptions of the '510 or '479 patents, or to CLS’s stipulations regarding claim construction, all the while claiming to rely on “the record.” See Rader/Moore Op. at 1311 (“The record in this case shows.... ”); id. at 1312 (“Further, the record again shows_”). And, they summarily reject the trial court’s assumption that the method claims require the same computer implementation as the system claims. Id. at 1312 (“[T]he district court assumed the single fact that the method claims , are implemented by computer. Putting to the side whether this construction was correct, even assuming the meth *1330 od claims require use of a computer in some unspecified way, this implicit reference to computer implementation is not, by itself, enough.” (citations omitted) (internal quotation marks and ellipsis omitted)). As explained above, however, the actual record establishes that the method claims require more than the use of a computer in some unspecified way. CLS has conceded as much and the trial court found as much.
Alice’s expert testified that “[sjpecific terms in the claims 33 and 34 [of the '479 patent],” “including], for example, ‘shadow credit record,’ ‘shadow debit record,’ and ‘transaction,’ ” “would be understood by the person of ordinary skill in the art to require that the methods recited in those claims are electronically implemented by a computer coupled to' a data storage unit.” Ginsberg Deck ¶ 32. That is, “the particular methods claimed in these patents only work, as intended, when carried out using a computer.” Id. ¶ 41. Once the trial court chose to proceed on the assumption that computer implementation is required for the method claims, it is the written description—the same written description that informs the system claims—which tells us just what the nature of that computer implementation is.
For this reason, we believe that Chief Judge Rader and Judge Moore’s analysis in Part VI of the collective opinion is internally inconsistent with the analysis the four of us employ in Part V of that opinion. Specifically, when analyzing the system claims, we note that “[tjhe specification also includes numerous flowcharts that provide algorithm support for the functions recited in the claims.” Rad-er/Linn/Moore/O’Malley Op. at 1307. We also note that “the '375 Patent discloses at least thirty-two figures which provide detailed algorithms for the software with which this hardware is to be programmed.” Id. at 1307. Relying on the details disclosed in Fig. 16 of the '375 patent, we assert that “[Ijabeling this system claim an ‘abstract concept’ wrenches all meaning from those words, and turns a narrow exception into one which may swallow the expansive rule (and with it much of the investment and innovation in software).” Id. at 1309. We do not see how Chief Judge Rader and Judge Moore, when analyzing the method claims, can ignore the fact that the specific functionality described in the figures applies just as much to. them as to the system claims. Chief Judge Rader and Judge Moore, in Part V of the collective opinion, acknowledge that the flow charts in the '375 patent depict the algorithms which the software runs—i.e., the subject matter of the method claims. And the same Figure 16 is present in the '479 and '510 patents. In this regard, barring an actual construction of the claims, we must assume the method claims are just as specific as the system claims, and merit the same treatment we afford those latter claims.
Judge Lourie not only divorces his analysis from the record, he turns it on its head. Although Judge Lourie mentions the agreement between the parties and trial court regarding claim construction, see Lourie Op. at 1285-86, he ignores the substance of the stipulations and assumptions upon which the proceedings below were predicated—i.e., that the method claims are narrowed by incorporation of all electronic aspects of the system claims, see id. at 1286 (“First, the requirement for computer implementation could scarcely be introduced with less specificity; the claim lacks any express language to define the computer’s participation.”). He then takes it upon himself to construe the claims, giving the method claims their broadest possible interpretation in the process. See id. at 1286 (construing the method claims such that “[tjhere is no specific or limiting recitation of essential or improved computer technology, and no reason to view the *1331 ■computer limitation as anything but insignificant postsolution activity relative to the abstract idea” (citations omitted) (internal quotation marks omitted)); id. at 1287 (construing “shadow record” as “reciting no more than the necessary tracking activities of a supervisory institution”). Indeed, Judge Lourie begins, not with the record, or even a proper exercise in claim construction, but with identification of what he finds to be the fundamental concept “wrapped up in the claim.” Id. at 1282. From there, he searches the words in the claims for “substantive limitations that narrow, confine, or otherwise tie down the claim.” Id. at 1282. By starting with a paraphrased abstraction of the claims and excluding the record evidence regarding the meaning of the claims, Judge Lourie preordains the method claims ineligible. Judge Lourie then reads into the system claims the same abstraction he felt damned the method claims.
Thus, Judge Lourie explicitly finds that “[t]he computer-based limitations recited in the system claims here cannot support any meaningful distinction from the computer-based limitations that failed to supply an ‘inventive concept’ to the related method claims.” Id. at 1290. The “abstraction” he ferrets from his own reading of the method claims, thus, works much like a computer virus to infect his analysis of all of the claims, regardless of their limitations. Indeed, he actually strips the claims of their detail and limitations—in direct contravention of the Supreme Court’s admonitions in Diamond v. Diehr, 450 U.S. 175, 188, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981)—calling it mere “extravagant language.” Lourie Op. at 1286-87.
We do not believe a patent eligibility inquiry can be disembodied from the actual claims at issue, with their attendant limitations. The analytical process in which Judge Lourie engages is at odds with the most basic concepts that govern our patent system. See Giles S. Rich, Extent of Protection and Interpretation of Claims—American Perspectives, 21 Int’l Rev. of Indus. Prop. & Copyright L. 497, 499 (1990) (“[T]he name of the game is the claim.”); see also Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed.Cir.2005) (en banc) (“It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude.” (internal quotation marks omitted)). His methodology just cannot be right.
While it may be possible to construe the method claims in such a way that they would read like those in Bilski v. Kappos, — U.S.-, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010), and, thus, be patent ineligible, we see no intellectually sound way to distinguish the method claims as construed by the district court from the system claims.
Ill
We assume our colleagues feel free to ignore the record—or, more appropriately, the lack thereof—in this case because claim construction is a question of law which this court reviews de novo. See Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed.Cir.1998) (en banc). Whether review is de novo or not, however, it still must be a “review”—it must be premised on a record below in which all relevant claim construction issues were vetted and in which the parties had an opportunity to proffer intrinsic and extrinsic evidence which would inform the claim construction process. None of that occurred in this case. Instead, Alice’s evidence and arguments were proffered and accepted by all as established fact. We are not persons of skill in the art and cannot open the record for proceedings that did not occur below. We are a re *1332 viewing court whose review must be predicated upon the record presented.
For these reasons, we agree with CLS, and with virtually every amicus to consider these claims, that all asserted claims must rise or fall together, because they all contain the same computer-based limitations.
IV
We turn to our view of the claims at issue here. This section of our opinion need not detain long. Along with Chief Judge Rader and Judge Moore, we have already explained why the system claims in this case are patent eligible and are not swallowed up by the exception from patent eligibility for claims that do no more than recite abstract ideas. See Rad-er/Linn/Moore/O’Malley Op. Part V. As we note, the claimed data processing system “includes at least four separate structural components” that perform very specific functions, id. at 1307, see also Moore Op. at 1320 (“[Claim 1 of the '375 patent] is a pure system claim, directed to a specific machine configured to perform certain functions”), and to describe the system as an abstraction ignores what is claimed, see Rader/Linn/Moore/O’Malley Op. at 1309 (“Labeling this system claim an ‘abstract concept’ wrenches all meaning from those words, and turns a narrow exception into one which may swallow the expansive rule (and with it much of the investment and innovation in software).”), see also Moore Op. at 1320 (“[I]t is impossible to conclude that this claim is merely an abstract idea.”).[4]
For the reasons we describe herein, moreover, we would employ the same rationale we employed for the system claims to find the method and media claims patent eligible as well. The trial court construed these claims to require all the computer-implemented limitations of the system claims. Indeed, in doing so, the trial court conceded that there was meaningful support in the written description of the '479 and '510 patents for that construction. We have no record upon which to disagree with that construction of these claims, one which both parties continue to urge upon us. And, it is a careful assessment of the claims—with all their limitations—which must guide our inquiry.
As we said in the panel opinion in this case, moreover, assuming the presence of all the computer-based limitations in the written description, none of these claims are unduly pre-emptive. While the abstract idea at their heart may be the use of an intermediary to facilitate financial transactions, the claims here are directed to very specific ways of doing that—using “shadow credit record[s]” and “shadow debit record[s]” that are adjusted only if the “transactions ... do not result in the value of the shadow debit record being less than the value of the shadow credit record at any time,” making the permitted transactions “in chronological order,” and exchanging “credits” and “debits” “in accordance with the adjustments of the said permitted transactions.” '479 patent col. 65 11. 23-50. While it is possible these claims may have been obvious over the prior art—which, of course, would include the abstract idea itself—they do not preempt all commercial uses or applications of that idea.
V
We finally note that certain Amici express concern regarding the proliferation and aggressive enforcement of low quality software patents. See Br. of Amici Curiae Google Inc., Dell Inc., Facebook, Inc., *1333 Homeaway, Inc., Intuit Inc., Rackspace Hosting, Inc., Red Hat, Inc., and Zynga Inc. in Supp. of Pet’rs at 23-25 [hereinafter “Google Br.”]; Amici Curiae Internet Retailers’ Corrected Br. in Supp. of Neither Party at 14-22 [hereinafter “Internet Retailers Br.”]. They seem to believe that patents on early generation technology inhibit technological advances. See Google Br. 23-25; Internet Retailers Br. 14-22. Based on these concerns, these Amici ask us to find all the claims at issue in the patents before us ineligible under the abstract ideas exception to § 101.
We do not discount Amici’s concerns, we just disagree with what they ask us to do to quell them. Congress can, and perhaps should, develop special rules for software patents. It could, for instance, limit their life by limiting the term of such patents. See Peter S. Menell, A Method for Reforming the Patent System, 13 Mich. Telecomm. & Tech. L.Rev. 487, 501 (2007) (arguing patent reform should include “identifying and evaluating categorical reform options (such as excluding business method patents or altering the duration of software patents).”). Or, Congress could limit the scope of software patents by requiring functional claiming. Cf Mark A. Lemley, Software Patents and the Return of Functional Claiming, 2013, at 42, available at http://papers.ssrn. com/sol3/papers.cfm?abstract_id=2117302, Stanford Pub.L. Working Paper No. 2117302, (arguing that the problems with software patents can be remedied through strict enforcement of the 35 U.S.C. § 112(f) limitations on functional claiming, not by “retroactively invalidating] tens of thousands of software patents”). Or, it could do both, or devise some other rule. But broadening what is a narrow exception to the statutory definition of patent eligibility should not be the vehicle to address these concerns. While Congress may, this court may not change the law to address one technological field or the concerns of a single industry. See United States v. Rutherford, 442 U.S. 544, 555, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979) (“Under our constitutional framework, federal courts do not sit as councils of revision, empowered to rewrite legislation in accord with their own conceptions of prudent public policy.”); see also Anderson v. Wilson, 289 U.S. 20, 27, 53 S.Ct. 417, 77 L.Ed. 1004 (1933) (“We do not pause to consider whether a statute differently conceived and framed would yield results more consonant with fairness and'reason. We take the statute as we find it.”).
Thus, whatever the merits of such concerns, the answer is not to rewrite the law by broadening the abstract ideas exception to § 101, especially if the only way to do so is to ignore the limitations in the claims actually before us.
VI
Appropriately treating the abstract ideas exception to patent eligibility under 35 U.S.C. § 101 as a narrow judge-made exception to a broad statutory grant, and being true to the record and claim constructions we are presented, we would find all claims at issue in this case patent eligible and would vacate the judgment of the lower court and remand for further proceedings. We dissent from this court’s judgment which has the effect of doing otherwise.
Additional reflections filed by RADER, Chief Judge.
RADER, Chief Judge.
In the twenty-fifth year of my judicial service, I am wont to reflect on my early judicial experience in search of the confidence in the correctness of my judicial views that I then enjoyed. In this instance, my reflection carries me back to *1334 one of the-first cases I helped decide as a new Circuit Judge on this court.
The case, Arrhythmia Research Tech. v. Corazonix Corp., 958 F.2d 1053 (Fed.Cir.1992), involved a patent on a software invention that allowed for swift computer analysis of electrocardiogram images to detect heart attack risks. Of course, I encountered the case flushed with confidence and a commitment to the law as written by our legislative branch, the branch to which I had dedicated my entire early career. In the face of this marvelous way to protect human life more efficiently and reliably, I found myself certain that this invention would “promote the Progress of the useful Arts.” Moreover, the investment in research to develop that new method cried out for protection. Without protection, I reasoned, investors would quickly opt to put their resources into new cosmetics or weight control improvements—safer propositions. In sum, I thought this case was easy.
Therefore, I could only describe my emotion as surprise that my senior colleagues on the panel, Judges Newman and Lourie, struggled mightily. The author for the court performed impressive feats of intellectual acrobatics trying to gain some handhold to show that the mathematic equations in the method had some physical connection and no "preemptive effect, whatever those concepts mean (and I still do not know if they have any meaning, let alone what that meaning might be). The court succeeded in converting “applying,” “determining,” and “comparing” ■ into “physical process steps that transform one physical, electrical signal into another.” Id. at 1059.
With some trepidation, I ventured to express my view that the statute settled the question without the need for laborious analysis. At the close of my opinion, I expressed a little frustration: “When all else fails ■ ... consult the statute.” For me, Parker v. Flook, 437 U.S. 584, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978), Gottschalk v. Benson, 409 U.S. 63, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972), In re Abele, 684 F.2d 902 (CCPA 1982), In re Walter, 618 F.2d 758 (CCPA 1980), and In re Freeman, 573 F.2d 1237 (CCPA 1978), vindicated the proposition that “all else had failed.” And for me, the magisterial statute with its sweeping inclusion of “any” process and even “improvements thereon” without any of the written exceptions for “software per se” or other legislative exceptions featured in failed European and Asian statutes settled the question. Indeed, as the law expressed and the Supreme Court recognized, an invention could extend to “anything under the sun that is made by man.” Diamond v. Diehr, 450 U.S. 175, 182, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981) (quoting 182 S.Rep. No.1979, 82d Cong., 2d Sess., 5 (1952) and H.R.Rep. No.1923, 82d Cong., 2d Sess., 6 (1952)).
As I noted at the outset, a quarter century has passed. After In re Alappat, 33 F.3d 1526 (Fed.Cir.1994) (en banc), and a few other opinions, the law of patent eligibility enjoyed a halcyon decade of reliance on the statute. Inventions rose and fell, but based on the merits of their contributions to the progress of the useful arts, not on the basis of undefined and unproven judicial abstractions like “abstractness” or “preemption.” Prior art governed the patentability of claims. The separate concept of patent eligibility of subject matter (not a claim-driven concept at all) was not subject to judicial preference for a broad or narrow view of formless substance.
Although Diehr and Diamond v. Chakrabarty, 447 U.S. 303, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980), betokened decades of enforcing the patent law as written, these giants too have bowed to new judicial influences. Twenty years ago, Judges New *1335 man, Lourie, and I still unanimously agreed on the outcome of Arrythmia. The intervening commotion leaves us with little, if any, agreement amongst us even though the statute has not changed a syllable.
Thus, I find myself writing again as I did in 1992. And I find myself resorting to exactly the same phrase:
When all else fails, consult the statute! And for evidence that all else has failed, I need only recite Bilski v. Kappos, — U.S. -, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010), Mayo Collaborative Servs. Inc. v. Prometheus Labs., Inc., — U.S.-, 132 S.Ct. 1289, 182 L.Ed.2d 321 (2012), Ass’n for Molecular Pathology v. U.S. Patent & Trademark Off., 689 F.3d 1303 (Fed.Cir.2012), cert. granted in part, — U.S.-, 133 S.Ct. 694, 184 L.Ed.2d 496 (2012), MySpace, Inc. v. GraphOn Corp., 672 F.3d 1250 (Fed.Cir.2012), Dealertrack, Inc. v. Huber, 674 F.3d 1315 (Fed.Cir.2012), and Classen Immunotherapies, Inc. v. Biogen IDEC, 659 F.3d 1057 (Fed.Cir.2011), and this list can and will go on and grow.
And the remedy is the same: consult the statute! The statute offers a patent to both inventions and discoveries, including simply an improvement on a known process or product. The statute further directs that even the mere new use of an old machine is eligible for patenting, with, of course, a high obstacle of meeting the conditions of patentability set forth in Sections 102 and 103 of the Patent Act ahead. See S.Rep. No. 82-1979 at 17 (explaining that the new use of a known machine or composition of matter is eligible for patenting “provided the conditions of patentability are satisfied.”) In that regard, the Supreme Court long ago held’ that Section 101 is not a “condition of patentability.” Diehr, 450 U.S. at 189-90, 101 S.Ct. 1048 (citing In re Bergy, 596 F.2d 952, 963 (CCPA 1979) (Section 101 “was never intended to be a ‘standard of patentability,’ the standards, or conditions as the statute calls them, are in 102 and 103”)). Finally, the statute does not list Section 101 among invalidity defenses to infringement. See 35 U.S.C. § 282 (while invalidity for failing to meet a “condition of patentability” is among the authorized defenses, Section 101 is not a “condition of patentability”).
And what about “exceptions” like natural laws and natural phenomena? Of course, these are universal constants created, if at all, only by God, Vishnu, or Allah. But, for perspective, even gravity is not a natural law in Einsteinian theory, but a symptom of a curved universe. Einstein posited the speed of light as the only true natural constant. Thus, in context, equating the personalized medicinal effect of a human-created pharmaceutical in patients of different metabolic rates and genetic makeups with the speed of light (or even gravity) is only possible in a netherworld of undefined judicial insights. Moreover, to inject the patentability test of “inventiveness” into the separate statutory concept of subject matter eligibility makes this doctrine again “the plaything of the judges who, as they became initiated into its mysteries, delighted to devise and expound their, own ideas of what it meant; some very lovely prose resulting.” Giles S. Rich, Principles of Patentability, 28 Geo. Wash. L.Rev. 393, 404 (1960).
I enjoy good writing and a good mystery, but I doubt that innovation is promoted when subjective and empty words like “contribution” or “inventiveness” are offered up by the courts to determine investment, resource allocation, and business decisions. Again, it is almost ... well, “obvious” ... to note that when all else fails, it makes sense to consult the simplicity, clarity, and directness of the statute.
As I start my next quarter century of judicial experience, I am sure that one day I will reflect on this moment as well. I *1336 can only hope it is a brighter reflection than I encounter today.

. “Philosophical” means "scientific” in the language of that era. Integra Lifesciences I, Ltd. v. Merck KGaA, 331 F.3d 860, 874-75 n. 8 (Fed.Cir.2003) (Newman, J., dissenting).

. See, e.g., Adam Liptak, Supreme Court to Look at a Gene Issue, N.Y. Times, Nov. 30, 2012 ("Myriad and other gene patent holders have gained the right to exclude the rest of the scientific community from examining the naturally occurring genes of every person in the United States”); Michael Specter, Can We Patent Life?, The New Yorker, April 2, 2013 (“Any scientist who wants to conduct research on such a gene—even on a small sequence of its DNA—has to pay license fees.”).

. See Lourie Op. at 1281 ("Guarding against the wholesale preemption of fundamental principles should be our primary aim in applying the common law exceptions to § 101.”); Rader Op. at 1300 n. 3 (permissible experimentation is limited to "academic research” “without commercial ends”).

. Albert Einstein & Leopold Infeld, The Evolution of Physics 310 (1938).

. Illustration is seen in the Orphan Drug Act, 21 U.S.C. § 360aa-360ee (1997), which provides patent-like exclusivity and is reported to have provided treatment for many previously untreated diseases. Food & Drug Admin., Developing Products for Rare Diseases & Conditions, http://www.fda.gov/ForIndustry/ DevelopingProductsforRareDiseases *1327 Conditions/default.htm ("The [Orphan Drug] program has successfully .enabled the development and marketing of more than 400 drugs and biologic products for rare diseases since 1983. In contrast, fewer than 10 such products supported by industry came to market between 1973 and 1983.”). And the experience of the Bayh-Dole Act is that patent exclusivity has moved much university research into public benefit. See Wendy H. Schacht, Cong. Research Serv., RL 32076, The Bayh-Dole Act: Selected Issues in Patent Policy and the Commercialization of Technology 1 (2005).

. We cite to Parts I-V and VII of our collective opinion as the "Rader/Linn/Moore/O’Malley Op.;” we refer to Part VI of that opinion, which is authored by Chief Judge Rader and Judge Moore only, as the "Rader/Moore Op.”

. The trial court misspoke here; CLS conceded to a narrower construction—not a broader one. That is, although, on their face, the claims arguably cover all applications of the claimed method, not just electronic applications, i.e., they are broad, CLS agreed to limit those claims to electronic implementations of all aspects of the claimed methods.

. The following exchange took place during oral argument:
Judge O’Malley: [Y]ou conceded that ... the term shadow credit and debit record and transaction all recite electronic implementation ... on a computer or some other electronic device.
And then she [the district judge] later pointed out that even at the Markman stage you said that "let's assume that ... we have to have all of these activities—
Mr. Perry: Correct Your Honor
Judge O'Malley:—implemented through a system on a computer.”
Mr. Perry: That's correct Your Honor.
Oral Arg. 11:29-11:55.

. We agree with Judge Moore's similar analysis of the system claims in her separate opinion, which we join in full.